The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Bain Jones, Jr. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the addition of Finding of Fact Nos. 17 and 18 and minor corrections in the Conclusion of Law and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. Plaintiff was the employee of defendant employer Lexington Furniture on 9 February 1995.
4. Plaintiff's average weekly wage is $310.37, yielding a compensation rate of $206.88, as determined by a Form 22 filed with the Commission.
5. The issues before the Commission are (1) whether plaintiff sustained a compensable injury by occupational disease on or about February 1995, while working for defendant employer; (2) if so, to what amount of past, present and future medical and disability compensation is plaintiff entitled under the Act; and (3) to what extent are defendants responsible for providing compensation to plaintiff?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a married female with three children. She was born on 28 January 1959.
2. Plaintiff began her employment with defendant-employer on 26 January 1995. Prior to that time, she was employed for approximately six years as a waitress at various restaurants.
3. For the first few days of her employment with defendant-employer, plaintiff worked on the "kick line." She was thereafter transferred to the "mark line," where she was responsible for grading board lengths of lumber. Plaintiff's job consisted of standing at a roller conveyor belt. As board lengths were slid to her, she would grasp the board, turn it up on its edge, and mark any defects in the wood with a crayon marker. The board was then flipped, and the process repeated on the other side. Each board was between 2" and 3" thick, and from eight to sixteen feet in length. The lumber was primarily either poplar or oak, and each board weighed between eight to twenty-four pounds, depending on wood type and board length. The line would normally handle between 10,000 and 11,000 board feet a day, and plaintiff would be permitted two ten minute breaks and one thirty minute lunch period each day.
4. By the third day on the mark line, plaintiff began to experience pain in her hands and wrists. After a few weeks, she reported the problem to her supervisor who sent her to the company personnel manager. Plaintiff was given a splint for her right wrist to wear while working. Plaintiff wore the brace continually, including during the night.
5. Shortly thereafter, plaintiff required an additional brace for her left wrist.
6. In May, plaintiff was moved to the molding department due to her continued complaints of pain in her arms and hands. Her new job required her to remove strips of molding as they came out of the cutting machine.
7. In December 1995, plaintiff was placed on the putty line, where she was responsible for smaller pieces of wood. Finally, she was moved to the finish inspection line, where she was required to wipe stain and glaze from finished pieces of wood.
8. On 10 January 1996, plaintiff presented to Dr. Mark McGinnis, complaining of pain in her elbows, arms, and wrists. Dr. McGinnis diagnosed plaintiff as having bilateral carpal tunnel syndrome, and recommended surgical release.
9. On 21 February 1996, plaintiff presented to Dr. Scott McCloskey, seeking a second opinion regarding the necessity of surgery. Dr. McCloskey concurred with the findings of Dr. McGinnis, and also believed plaintiff suffered from some degree of ulnar nerve entrapment at the elbow on each side, known as tardy ulnar palsy; however, he recognized that the carpal tunnel problem was the more significant. He wrote plaintiff out of work on that date. On 23 February 1996 Dr. McCloskey performed a right carpal ligament release for plaintiff.
10. During the surgery, Dr. McCloskey noted that plaintiff had an extremely thickened carpal ligament. The condition of the nerve made plaintiff's prognosis for recovery uncertain.
11. Following surgery, plaintiff continued to see Dr. McCloskey for follow up visits. By 29 May 1996, plaintiff had recovered from the right wrist surgery sufficiently to schedule the procedure for the left wrist. Surgery on the left wrist was performed on 13 June 1996.
12. In August 1996, plaintiff was informed by defendant-employer that due to her continued absence for a period of six months, her employment was being terminated.
13. On 28 August 1996, Dr. McCloskey determined that plaintiff had sufficiently recovered from her surgery to attempt to return to work in a light duty job. On 17 September 1996, plaintiff began working as a waitress at a Waffle House restaurant.
14. Plaintiff next presented to Dr. McCloskey on 20 November 1996, complaining of having considerable difficulty with both arms, including pain and numbness. Plaintiff tested positive for Tinel's sign over the ulnar nerve at the elbows, and demonstrated a possible recurrence of carpal tunnel. Dr. McCloskey diagnosed plaintiff as having some recurrence of carpal tunnel syndrome, and that the tardy ulnar palsy had worsened. He recommended steroid injections for the left hand, and if successful, a repeat of the process on the right hand. Dr. McCloskey believed at this time that the tardy ulnar palsy was the greater of plaintiff's difficulties, and recommended surgical decompression.
15. Plaintiff has not as yet undergone further surgery, and therefore has not reached maximum medical improvement. Plaintiff's carpal tunnel syndrome and tardy ulnar palsy are a direct result of the repetitive motion activity plaintiff was required to perform on her job with defendant-employer. Further, plaintiff's jobs with defendant-employer placed her at a greater risk of developing carpal tunnel syndrome and/or tardy ulnar palsy than that of the general public. There is no evidence in the record that plaintiff's current job as a waitress involves any repetitive motion activities of the type which would have caused either carpal tunnel syndrome or tardy ulnar palsy, or would have placed plaintiff at a greater risk than that faced by the general public.
16. The release surgery performed on plaintiff's wrists was reasonably necessary to provide relief or affect a cure for plaintiff's carpal tunnel syndrome, and the future release surgery on plaintiff's elbows is reasonably necessary to affect a cure or provide relief from plaintiff's tardy ulnar palsy.
17. Carpal tunnel syndrome and tardy ulnar palsy can be caused by repetitive motion activities. Plaintiff's job requirements on the various production lines, and specifically on the mark line, constituted such activity and resulted in her sustaining both carpal tunnel syndrome and tardy ulnar palsy. The repetitive motion required to perform plaintiff's jobs on the various production lines, specifically the mark line, was peculiar to her job and placed her at a greater risk of contracting those occupational diseases than that of the general public. Therefore, plaintiff's condition is an occupational disease as defined by N.C. Gen. Stat. § 97-53(13).
18. Plaintiff had not experienced problems with her hands, wrists, or elbows, prior to her employment with defendant-employer. The production line jobs involved continuous repetitive motion activities for plaintiff's entire work day. Plaintiff was not exposed to repetitive motion activities outside of her employment during the period in which the condition was developed. Accordingly, plaintiff's occupational disease is shown to be causally related to her job with defendant-employer.
19. Plaintiff's average weekly wage is $310.37, yielding a compensation rate of $206.88.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. For an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), the plaintiff must show that (1) her condition is due to causes and conditions characteristic of and peculiar to her employment, (2) that her particular employment placed her at a greater risk than the general public of contracting the disease, and (3) that there is a causal connection between her condition and her employment. Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
2. Circumstances which may be considered in establishing whether there is a causal connection between a disease and an employee's occupation include (1) the extent of exposure to the disease or disease-causing agents during employment; (2) the extent of exposure outside employment; and (3) the absence of the disease prior to the work-related exposure, as shown by plaintiff's medical history. Booker v. Duke Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979).
3. Defendants are responsible for temporary total disability payments in the amount of $206.88 weekly, for the period of 21 February 1996 through 8 September 1996 when plaintiff returned to the work force, and for any time thereafter during which plaintiff is totally incapacitated due to surgery related to her compensable occupational diseases. N.C. Gen. Stat. § 97-29.
4. As a result of plaintiff's sustaining an occupational disease, defendants are responsible for payment of plaintiff's past and future medical expenses related to the occupational diseases. N.C. Gen. Stat. § 97-25.
5. Defendants are responsible for temporary partial disability payments pursuant to N.C. Gen. Stat. § 97-30, based on the difference between plaintiff's current weekly income and her average weekly wage while employed by defendant-employer, and continuing until plaintiff has reached maximum medical improvement. See Gupton v. Builders Transp., 320 N.C. 38,357 S.E.2d 674 (1987).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for all past and future medical services required by plaintiff as a result of her compensable occupational diseases of carpal tunnel syndrome and tardy ulnar palsy, including any surgery reasonably necessary to effect a cure or give relief from plaintiff's compensable occupational diseases.
2. Defendants shall pay plaintiff weekly compensation in the amount of $206.88 as compensation for lost wages between 21 February 1996 and 8 September 1996. This payment shall be made in a lump sum, subject to reasonable attorney's fees as discussed below.
3. Documentation shall be submitted to this Commission in order to determine plaintiff's temporary partial disability compensation. "For as long as her earnings remain below her pre-injury average weekly wage, defendants shall pay plaintiff temporary partial disability compensation for a period of 300 weeks, less the number of weeks of temporary total disability paid or to be paid. At such time as plaintiff has reached maximum medical improvement and has received her disability ratings, she may elect to continue to receive temporary partial disability or she may elect to be paid for her permanent partial impairment. If she elects to be paid for her permanent partial impairment, the defendants shall receive a credit for the amounts of temporary partial disability than have already been paid." That portion of temporary partial disability payments computed from 9 September 1996 until the present shall be paid in a lump sum. Continuing payments shall be made weekly. These payments are subject to a reasonable attorney's fees as discussed below.
4. Plaintiff's counsel is entitled to a reasonable attorney's fee of twenty-five percent of plaintiff's compensatory recovery to be paid as follows: Twenty-five percent of the lump sum awards discussed in Paragraphs 2 and 3 above shall be paid directly to plaintiff's counsel. Every fourth weekly payment made pursuant to Paragraph 3 above shall be paid directly to plaintiff's counsel.
5. Defendant shall pay the costs of this action.
This the ___ day of July 1998.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ _____________________ RENEE C. RIGGSBEE COMMISSIONER